Argued September 22, affirmed November 1, reconsideration denied
November 17, petition for review denied December 7, 1976

STATE ex rel WASHINGTON COUNTY
JUVENILE DEPARTMENT, *Petitioner-Respondent,*

*v.*

KENNETH M., *Respondent-Appellant.*

In the Matter of the Adoption of Troy M. and Stacey
M., Minors.

G. et ux, *Appellants,*

*v.*

STATE ex rel WASHINGTON COUNTY
JUVENILE DEPARTMENT, *Respondent.*

(Juv. Ct. No. 8719, No. A2433, CA 6457)

555 P2d 933

[ 185 ]

*Gary E. Rueppell,* Portland, argued the cause and filed the brief for appellant Kenneth M.

*Phillip M. Margolin,* Portland, argued the cause and filed the briefs for appellants Cecil and Eva G.

*David L. Slader,* Metropolitan Public Defender, Portland, argued the cause and filed the brief for respondent children.

No appearance for State of Oregon.

Before Schwab, Chief Judge, and Thornton and Tanzer, Judges.

TANZER, J.

**TANZER, J.**

This is an appeal by a father from an order terminating his parental rights to his two children and an appeal by his mother and stepfather denying their petition for adoption of those children.

On November 4, 1974, after a history of marital discord, the father killed his wife, the children's mother, in the presence of their three-year-old son, by stabbing her. Their other child, a one-year-old daughter, was in her crib in the next room. The father fled, leaving the son alone with the corpse of his mother as she lay in a pool of her own blood.

The father was convicted of murder and is currently serving a life sentence in the Oregon State Penitentiary. The next date set for a parole hearing in his case is January, 1985.

The two children were placed in temporary foster care and on April 4, 1975 they were placed in the legal custody of the paternal grandparents under the supervision of the Children's Services Division (CSD). On June 4, 1976 the circuit court ordered the father's parental rights terminated and committed the children to the permanent custody of CSD. The court also denied the paternal grandparents' petition for adoption. A stay was refused by the trial court and by this court. The children were then transferred to the custody of CSD for transitional care pending arrangements for an independent adoption. The father and grandparents immediately filed notices of appeal.

The orders followed an extensive hearing. We shall summarize the evidence without unnecessarily recounting details.

The murder, life sentence and distant parole availability are relevant to the question of termination of the father's parental rights. In addition there was conflicting evidence regarding the father's tendency to violence. Psychologists testified that the father was essentially passive and not prone to violence, except

upon extreme marital provocation. They hypothesized that the murder resulted from such provocation but that future violence was unlikely because of the father's progress in self-understanding through therapy and because of the unlikelihood that similar personal circumstances will recur in his life. There was countering testimony to show repeated prior acts of violence, primarily toward the wife, over a period of years. The trial court found the witnesses to violent events to be more credible than the expert witnesses and we must give great weight to that finding. The trial court reasoned that the father's propensity for future violence could more prudently be assessed from his history of actual violence than from psychological testing. Our review of the record leads us to agree with that weighting of future probabilities.

Incarceration of a parent alone is not cause for termination of that parent's rights, *State v. Grady,* 231 Or 65, 371 P2d 68 (1962). *But see State ex rel Juv. Dept. v. Archuletta,* 12 Or App 596, 506 P2d 540, *rev den* (1973), *State v. Blum,* 1 Or App 409, 463 P2d 367 (1970). Here there is more. We find that the murder of the mother in the presence of the children and the intentional denial to the children of the benefits of a maternal relationship constitutes "conduct * * * seriously detrimental to the child[ren]," and we conclude because of the father's life sentence for murder that "integration of the child[ren] into the home of the parent * * * is improbable in the foreseeable future due to * * * conditions not likely to change."[1] The

---

[1] ORS 419.523(2) provides:

"The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable [sic] future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(a) Emotional illness, mental illness or mental deficiency of the parent of such duration as to render it impossible to care for the child for extended periods of time.

children are entitled to a stable family relationship during their remaining formative years which the father cannot provide. The order terminating the father's parental rights in his two children is therefore affirmed.

■■ A termination order must also provide for disposition of the children so that they are not left in limbo. ORS 419.527[2] provides that we may either make the children wards of the court as dependent children, or commit them permanently to the custody of CSD with a view to adoption. In view of our judicial responsibility to protect "the right of a child to enjoy membership in a permanent home and family while he is still young," *Children's Services Div. v. Weaver,* 19 Or App 574, 578, 528 P2d 556 (1974), which right ORS 419.523 to 419.527 aim to promote, Holman, *Oregon's New Juvenile Code,* 39 Or L Rev 305, 311-312 (1960), we agree with the trial court that a permanent commit-

---

"(b) Conduct toward any child of an abusive, cruel or sexual nature.

"(c) Addictive use of intoxicating liquors or narcotic or dangerous drugs.

"(d) Physical neglect of the child.

"(e) Lack of effort of the parent to adjust his circumstances, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

[2] ORS 419.527 provides:

"(1) After the entry of an order terminating the rights of the parent or parents of the child, the court may:

"(a) Place the child in the legal custody and guardianship of a public or private institution or agency authorized to consent in loco parentis to the adoption of children. An order pursuant to this paragraph is a 'permanent commitment' for the purposes of ORS 109.305, 109.310 to 109.330 and 109.345 to 109.390; or

"(b) Make any order directing disposition of the child which it is empowered to make under ORS 419.472 to 419.590, 419.800 to 419.840 and subsection (2) of 419.990.

"(2) If the rights of only one parent have been terminated, the authority to consent to the adoption of the child as provided in paragraph (a) of subsection (1) of this section is effective only with respect to the parent whose rights have been terminated."

ment is the preferable alternative for children of this age. The termination order is therefore affirmed in all respects.

■■ We now consider the other order on appeal. A petition for adoption must allege the consent of the parent or parents or of an agency in loco parentis. Where, as here, a permanent commitment has been made to CSD, the consent of that agency to the adoption is an essential jurisdictional element, ORS 109.317(1)(b), 109.350, 109.390(3). *McCleskey v. Welfare Comm.,* 4 Or App 308, 477 P2d 235 (1970), *rev den* (1971). The harshness of giving a veto power to an administrative agency is tempered by the discretionary ability of the court to retain continuing jurisdiction as the agency performs its adoption responsibilities. *Children's Services Div. v. Weaver,* supra.

■■ Here, the petition for adoption was filed after the filing of the petition for termination. The petition showed the consent of the father to an adoption by his parents. Because the termination had not yet been determined, consent of CSD was not and could not have been recited. Therefore, CSD having sole authority to give consent, the petition for adoption is now insufficient.

It would be unfair to rule against the grandparents on technical grounds unless the procedural ruling makes substantive sense. After all, had we ruled otherwise and preliminarily granted the petition for adoption, the termination proceeding would have been moot. Here, it makes sense to give procedural precedence to the termination decision.

An adjudication which chooses the family environment in which troubled children are to mature requires social sensitivity and objectively deliberate analysis of the highest order. The more passionate the atmosphere, the more competitive the dispute, and the fewer options which are presented, the harder it is to discern the best interests of the children and to adjudicate wisely. It is therefore imperative that the

procedure be orderly, that all possible alternatives be explored, and that good social work to unite the children with their new family be facilitated, not constrained, by the adjudicative procedure. The procedure which best achieves those ends should control. These considerations lead us in this case to give precedence to the termination proceeding rather than to the adoption procedure.

Here the evidence is clear that the purpose of the petition for adoption is to avoid termination rather than to create a new parent-child relationship. The grandmother candidly admits that her purpose is to maintain the relationships of blood, whatever rearrangements of legal relationship may occur, and there is much to commend in her perception, concern, conduct and hopes. The disadvantage of focusing the adjudication on the adoption petition, however, is that the inquiry necessarily tends to concentrate on an investigation of whether the grandparents are satisfactory rather than on an inquiry into what is the best available situation for the children. Consequently, this hearing was not so much an adoption proceeding as a hard-fought, emotionally-wrought custody fight, when a more deliberate and dispassionate proceeding might have brought more benefit and less trauma to all parties.

What the children needed then and need still is a survey of all adoption possibilities, selection of the most suitable, and the provision of services designed to test and effectuate that selection. All of those functions can better be performed by a social service agency which is trained, equipped, staffed and charged with the duty of performing them, than by adversaries and judges. The order of permanent commitment to CSD has already allowed such an orderly and deliberate process to commence with the expectation that the agency will return to court at the earliest prudent time with its consent to a workable adoption. Indeed, it would be appropriate to consider a placement with the grandparents as one possibility, in view of the array of

insightful expert testimony, if this proceeding has not already destroyed that potential.

Therefore, the order denying the petition for adoption is also affirmed.[3]

Affirmed.

---

[3]The grandparents have moved to strike the transcript of a subsequent hearing held on June 12, 1976 as containing evidence irrelevant to the order of June 4. Because of our disposition of this case, it is not necessary to decide the difficult procedural question of whether this portion of the transcript is properly a part of the record.